UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------- x
                                                        :
JOHN KENNETH WALLACE                                    :        3:20 CV 0002 (RMS)
                                                        :
V.                                                      :
                                                        :
ANDREW M. SAUL, COMMISSIONER                            :
OF SOCIAL SECURITY                                      :        DATE: FEBRUARY 19, 2021
                                                        :
------------------------------------------------------- x
```

RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeks review of a final decision by the Commissioner of Social Security ("SSA") denying the plaintiff disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").

I.     ADMINISTRATIVE PROCEEDINGS

The plaintiff filed his application for DIB and SSI on December 16, 2010, claiming that he had been disabled since January 15, 2008, due to "cardiac" problems and depression. (Certified Transcript of Administrative Proceedings ["Tr."] 134, 149). The plaintiff's application was denied initially on May 16, 2011 (Tr. 134-48, 159-63), and upon reconsideration on January 3, 2012. (Tr. 166-84, 185-203).

On January 19, 2012, the plaintiff requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 256-58), and on November 14, 2012, a hearing was held before ALJ Ronald J. Thomas, at which the plaintiff and his mother, Jacqueline Wallace, testified. (Tr. 1589-1619). The ALJ subsequently issued an unfavorable decision on December 27, 2012, denying the plaintiff's claims for benefits. (Tr. 209-22). On February 15, 2013, the plaintiff submitted a request for review

of the hearing decision, and on March 28, 2014, the Appeals Council granted the plaintiff's request for review, vacated the ALJ's December 27, 2012 decision, and remanded the matter to the New Haven Hearings Office. (Tr. 229-33).

A second hearing was held before ALJ Thomas on June 26, 2015, at which the plaintiff, his mother, Dr. John Nowicki, the plaintiff's treating physician, and Howard Steinberg, a vocational expert, testified. (Tr. 1620-76). The ALJ issued a decision on October 27, 2015, denying the plaintiff's claims for benefits. (Tr. 1527-53). The same day, the plaintiff requested review of the hearing decision, and on February 24, 2017, the Appeals Council denied that request (Tr. 1477-82), thereby rendering the ALJ's decision the final decision of the Commissioner.

The plaintiff appealed the ALJ's decision to this Court in an action filed on April 24, 2017. *See Wallace v. Berryhill*, No. 17-CV-672 (RMS), 2018 WL 4253174 (D. Conn. Sept. 6, 2018) ("*Wallace I*"); (Tr. 1483-1525). On September 6, 2018, this Court granted the plaintiff's Motion to Reverse the Decision of the Commissioner and remanded the case for further development of the record. (*See* Tr. 1483-1525). In so doing, this Court found that "the ALJ repeatedly acknowledged that he lacked function by function analyses in the medical record and decided to apply the greatest weight on the one such analysis in the record which was not made by a treating source and which is not supported by any treating records from that provider." (*Id.* at 1524). This Court thus directed the ALJ, upon remand, to "solicit opinions about the plaintiff's functional abilities with and without substance use, and then consider that information in formulating his RFC assessment, which will require additional vocational findings." (*Id*. at 1524-25).

Upon remand, on January 15, 2019, the Appeals Council issued an order remanding the case to an ALJ for further proceedings "consistent with the order of the court." (Tr. 1471-76). The Appeals Council noted that the plaintiff had filed an application for SSI benefits on January 26,

2018, and the state agency had found him disabled as of February 1, 2016. (Tr. 1473; *see also* Tr. 1563-76). The Appeals Council affirmed that decision after concluding that it was supported by substantial evidence. (Tr. 1473). The Appeals Council then directed that the ALJ offer the plaintiff "an opportunity for a hearing, take any further action necessary to complete the administrative record and issue a new decision for the period prior to February 1, 2016." (Tr. 1474).

On August 7, 2019, ALJ Imelda K. Harrington held a hearing, at which the plaintiff and Richard Barry Hall, a vocational expert, testified. (Tr. 1419-69). The plaintiff was represented by counsel. At that hearing, the plaintiff amended his alleged onset date to February 23, 2012. (Tr. 1422). The ALJ issued a decision on September 17, 2019, denying the plaintiff's claims for benefits, from February 23, 2012 to January 31, 2016. (Tr. 1392-1408). Sixty day later, the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R § 404.984(d) ("If no exceptions are filed and the Appeals Council does not assume jurisdiction of your case, the decision of the administrative law judge becomes the final decision of the Commissioner after remand.").

The plaintiff filed his complaint in this pending action on January 2, 2020. (Doc. No. 1). The parties consented to the jurisdiction of a United States Magistrate Judge on January 8, 2020, and this case was transferred to the undersigned. (Doc. No. 9). On March 2, 2020, the defendant filed the certified administrative record (Doc. No. 11), and on May 15, 2020, the plaintiff filed his Motion to Reverse the Decision of the Commissioner (Doc. No. 13), with a Statement of Facts (Doc. No. 13-1), and brief in support (Doc. No. 13-2 ["Pl. Mem."]). On July 7, 2020, the defendant filed his Motion to Affirm the Decision of the Commissioner. (Doc. No. 14).

For the reasons stated below, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 13) is GRANTED such that this case is remanded, and the defendant's Motion to Affirm the Decision of the Commission (Doc. No. 14) is DENIED.

## II.     FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is discussed in the parties' respective Statement of Facts (Doc. Nos. 13-1, 14) and detailed in this Court's prior ruling in *Wallace I*. (Tr. 1483-1525). Though the Court has reviewed the entirety of the medical record, it cites only the portions that are necessary to explain this decision.

### A.     HEARING TESTIMONY

At the plaintiff's August 7, 2019 hearing, the plaintiff amended his alleged onset date to February 23, 2012, the date of the plaintiff's successful completion of the REACH program, a substance abuse recovery program. (Tr. 1422, 1431-32). The plaintiff testified that, in 2010, he suffered cardiac heart failure which caused oxygen deprivation, resulting in limitations to his short-term memory. (Tr. 1427-1430). Additionally, the plaintiff explained that since he stopped drinking, his "memory's gotten shot." (Tr. 1433). He can remember "things as a kid . . . for the most part" but has little short-term memory. (Tr. 1444).

The plaintiff testified that he went to the gym in 2012 but did not have motivation to go anymore, only showered once every three days, and, when he was placed on bipolar medication while treating at the REACH program, ate constantly, resulting in substantial weight gain. (Tr. 1434, 1437). He would wake up in the middle of the night from 2:00 a.m. to 4:00 a.m. to interact with friends in California, and he walked his dog throughout the day. (Tr. 1434-37). He did not work and volunteered "a couple times [but] didn't do well at it." (Tr. 1439).

As referenced in *Wallace I*, on March 26, 2015, the plaintiff reported to Dr. Carine Jean that he had a job interview for a Director of Finance position at Disney in California. (Tr. 1389). At the August 7th hearing, the ALJ asked the plaintiff about that interview but the plaintiff responded that he did not think he had such an interview, his "memory's shot," and he just did not remember that happening. (Tr. 1440-43).  In fact, the plaintiff did not recall ever seeing Dr. Jean. (Tr. 1442).

The plaintiff testified that he would "lose [his] breath" going upstairs and that his blood pressure would fluctuate which could cause him to fall.  (Tr. 1446). Additionally, he did not finish projects; he was "not the same guy [he] used to be[.]" (*Id.*).

The plaintiff has an MBA and worked as an accountant in Los Angeles before he stopped working in 2007.[1]  (Tr. 1457-59). The vocational expert testified that a person with the plaintiff's past work experience, who was capable of medium work with occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling, but never climbing ladders, ropes and scaffolds, avoiding concentrated exposure to extreme cold and avoiding moderate exposure to hazards and unprotected heights, could perform the plaintiff's past work.  (Tr. 1461).  If an individual had the same exertional limitations, and was limited to simple, routine tasks involving no more than simple short instructions and simple work-related decisions with few workplace changes, such an individual could not perform the plaintiff's past work. (Tr. 1462).  Such a person could, however, perform the sedentary work of a document preparer, the medium work of a packer, material handler and cleaner, and the light work of a parts cleaner, mail sorter, and office assistant. (Tr. 1464). Such jobs, however, would be precluded for an individual who would require frequent reminders, every hour throughout the workday, and who would need reminders to complete tasks.

---

[1] The plaintiff worked for Warner Music from 1999-2006 and for Dick Clark Productions for a short time in 2007. (Tr. 1456-57).

(Tr. 1464-65). The vocational expert explained that an employer would tolerate a maximum of ten percent off-task behavior, and one or two absences each month. (Tr. 1465-66).

The vocational expert based his testimony on his "48 years of experience in job placement, labor market surveys, and job analysis." (Tr. 1465). Additionally, the vocational expert explained that he "attend[s] educational conferences to maintain" his credentials, "interact[s] with [his] colleagues who do the same type of work[,]" and uses Job Browser as a resource. (Tr. 1467).

### B.     RELEVANT MEDICAL HISTORY POST-DATING JUNE 22, 2015

Familiarity with the Court's twenty-right page summary of the plaintiff's complete medical history from August 2008 to June 22, 2015 is presumed. (Tr. 1483-1509). The plaintiff's medical treatment continued as of July 8, 2015, when he was seen for a mental health appointment with Dr. Swati Joshi of Milford Medical. (Tr. 1890-94). Dr. Joshi noted the plaintiff's "extensive psych history with bipolar disorder, anxiety, [and] depression." (Tr. 1890). The plaintiff reported "bouts of depression but doing well on medications[.]" (*Id.*). At that time, the plaintiff was prescribed: Abilify, Crestor, Lamictal, Levothyroxine; Lexapro; Lorazepa; Losartan; Metformin; Propranolol, Singulair, Trazodone, Torsemide (a diuretic); Victoza, and Welchol (Tr. 1891-92). He had a BMI of 33.5, which is in the obesity range (Tr. 1893).

On August 26, 2015, Dr. Joshi noted that the plaintiff was "very forgetful." (Tr. 1874-78). Dr. Joshi "advised patient and mom to talk to his psychiatrist about getting off all medications, will research a rehabilitation facility for possible detox. Advise patient to have Sloan-Kettering send us notes regarding management of his erectile issues." (Tr. 1878).

Two weeks later, on September 10, 2015, Dr. Joshi noted the plaintiff's complaints of "fatigue and feeling very groggy and sleepy over the last few days." (Tr. 1873). Dr. Joshi again recommended discussion with the plaintiff's psychiatrist with an eye toward getting him off his

"psych meds" "as some of this could be causing his fatigue and lowered blood pressure." (Tr. 1873).

On October 8, 2015, Dr. Joshi stated, "[C]ardiologist recommending weight management medication. Urologist cleared him for testosterone injections" (Tr. 1864). There is no corresponding record from the plaintiff's cardiologist. Dr. Joshi advised the plaintiff to "follow up with endo and cardio. Bipolar: needs psych referral new referral, needs to switch." (Tr. 1867).

At his November 5, 2015 visit with Dr. Joshi, the doctor noted that the plaintiff was "seeing a new psychiatrist today, mother states not taking meds, patient states takes it at different times. Will discuss with psych, patient wants to get off meds. . . . on testosterone by Sloan-Kettering for low testosterone." (Tr. 1862-63). On January 25, 2016, Dr. Joshi noted that the plaintiff had been at the Norwalk Hospital Emergency Room because he "choked on bread and had blacked out and EMT took over and went to the ER. Chest x-ray showed no aspiration or fluid in the lungs. Patient overall doing well." (Tr. 1851).[2]

---

[2] The remaining medical records are for the period after February 1, 2016, the period during which the plaintiff was found disabled, and thus, are not at issue on this appeal. On February 26, 2016, the plaintiff underwent an upper endoscopy (Tr. 1998-2002) which revealed "Stage III esophageal cancer." (Tr. 1846). The plaintiff underwent radiation and chemotherapy. (*Id.*). Dr. Joshi noted on July 7, 2016 that the plaintiff recently completed chemotherapy, and lung nodules were found on a CT scan. (Tr. 1841-1845). The plaintiff complained of malaise, nausea, dizziness, and fatigue; his mother reported forgetfulness and hallucinations. (Tr. 1841). A February 17, 2016 visit note from Christian Counseling center related that the plaintiff was going to the gym three times per week. (Tr. 2019). Dr. Joshi noted on March 3, 2016, however, that "he does not exercise regularly." (Tr. 1046). By November 16, 2016, the plaintiff had lost seventy pounds since his cancer diagnosis, and he "attend[ed] gym." (Tr. 2016). He went to meditation and yoga sessions at the Smilow Cancer Center.

On May 23, 2017, the plaintiff's cholesterol levels were "extremely high," and his cardiologist wanted to put him "back on his statin[]" (Tr. 1826), suggesting that the plaintiff was under ongoing cardiac care. Due to concerns over dizziness and memory loss, an MRI of the brain and ultrasound of the carotid arteries was recommended. (Tr. 1830). The MRI showed "very small old cortical infarcts involving the left parietal lobe. There are no acute abnormalities. There has been no interval change [since the April 17, 2015 MRI]." (Tr. 1903). The ultrasound showed "moderate atherosclerotic disease" in the carotid arteries. (Tr. 1904). A CT scan on June 14, 2017 showed "Bilateral carotid and vertebral artery calcifications with associated stenosis, approximately 60% within the proximal right internal carotid, at least 70% within the proximal left internal carotid. Short-segment high grade stenoses of both vertebral arteries proximally is suspected, but difficult to accurately measure." (Tr. 1900).

7

III.    THE ALJ'S DECISION

Following the five-step evaluation process,³ the ALJ first found that the plaintiff met the insured status requirements through December 31, 2012 (Tr. 1398), and that the plaintiff did not engage in substantial gainful activity from February 23, 2012, the alleged onset date, through January 31, 2016. (Tr. 1398, citing 20 C.F.R. §§ 404.1571 *et seq.*, and 416.971 *et seq.*)).

At step two, the ALJ concluded that the plaintiff had the severe impairments of cardiomyopathy, alcohol abuse, anxiety disorder, organic mental disorder, affective disorder, and ischemic heart disease (Tr. 1398, citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)), but that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 1399, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

At step three, the ALJ found that the plaintiff had the residual functional capacity ("RFC") to perform medium work, as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c), except that he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl but could never

---

On October 16, 2017, the plaintiff had a bout of pancreatitis and an infected pancreas; at that time, he had lost thirty pounds and "already resumed most activities of daily living." (Tr. 2012). He was sleeping poorly and napping frequently. (*Id.*).

³ First, the ALJ must determine whether the claimant is currently working. *See* 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a). If the claimant is currently employed, the claim is denied. *Id.* If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations [the "Listings"]. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79-80 (2d Cir. 1998). If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

climb ladders, ropes or scaffolds, and must avoid concentrated exposure to extreme cold and moderate exposure to hazards and unprotected heights. (Tr. 1400-01). Additionally, the plaintiff was limited to performing simple, routine tasks involving no more than simple, short instructions and simple, work-related decisions with few workplace changes. (Tr. 1401). In reaching this decision, the ALJ gave "partial weight" to the opinion of the State agency document reviewers, "great weight" to the opinions of the non-examining State agency consultants who assessed the plaintiff's mental capacity (*see* Tr. 134-48, 166-84), "no weight" to the opinion of the plaintiff's treating physician, Dr. John Nowicki (*see* Tr. 984), "no weight" to the opinion of his treating cardiologist, Dr. Steven Kunkes (*see* Tr. 983), "minimal weight" to the opinion of Debra Tomaselli, LMFT (*see* Tr. 1048, 1050), and "partial weight" to the February 2015 opinion of neuropsychologist, Timothy Beliveau, Ph.D. (*See* Tr. 1138-43).

The ALJ concluded that the plaintiff was unable to perform his past relevant work. (Tr. 1405, citing 20 C.F.R. §§ 404.1565 and 416.965). The ALJ found, however, that there were jobs that existed in significant numbers in the national economy that the plaintiff could perform. (Tr. 1406). Specifically, he concluded that, at the medium exertional level, the plaintiff could perform the work of a quotation clerk, packer, material handler, and cleaner, and, at the light exertional level, the plaintiff could perform the work of a parts cleaner, mail sorter, and office assistant. (Tr. 1406-07). Accordingly, the ALJ found that the plaintiff was not under a disability at any time from February 23, 2012 through January 31, 2016. (Tr. 1407).

## IV. STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported

by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citation omitted). The court may "set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (internal quotation marks & citation omitted); *see also* 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *see Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citation omitted). "The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact." *Gonzalez v. Apfel*, 23 F. Supp. 2d 179, 189 (D. Conn. 1998) (citing *Rodriguez v. Califano*, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. *See Dotson v. Shalala*, 1 F.3d 571, 577 (7th Cir. 1993) (citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. *See id.* The Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. *See* 42 U.S.C. § 405(g); *see also Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citation omitted); *Eastman v. Barnhart*, 241 F. Supp. 2d 160, 168 (D. Conn. 2003).

V.  DISCUSSION

The plaintiff contends that the ALJ erred in three respects: 1) the ALJ failed to develop the administrative record by not obtaining medical source statements from the plaintiff's treating physicians, as directed by the Court's remand order in *Wallace I* (Pl.'s Mem. at 1-9); 2) the ALJ violated the treating physician rule (*Id*. at 9-13); and 3) the ALJ's "Step Five Findings" were unsupported. (*Id*. at 14-26).

In response, the defendant argues first that the ALJ appropriately developed the administrative record in light of changed circumstances. (Def.'s Mem. at 4-7). Second, the defendant contends that substantial evidence supports the ALJ's assessment of the medical opinions. (*Id.* at 7-13). Finally, the defendant asserts that substantial evidence supports the ALJ's Step Five determination. (*Id.* at 13-16).

### A.     THE ALJ DID NOT SATISFY HER DUTY TO DEVELOP THE RECORD

As this Court discussed in *Wallace I*:

> When the Appeals Council remanded this case in March 2014, it held that "[t]he record lack[ed] substantial evidence to support the conclusion that a significant number of jobs exist which the claimant can perform." (Tr. 231). Upon remand, the ALJ was to "[o]btain updated evidence concerning the claimant's mental and/or physical impairments in order to complete the administrative record in accordance with the regulatory standards regarding consultative examinations and existing medical evidence (20 CFR 404.1512-1513 and 416.913)." (Tr. 231). The Appeals Council emphasized that "[t]he additional evidence may include, if warranted and available, a consultative examination and medical source statements about what the claimant can still do despite the impairments." (Tr. 231).

(Tr. 1516). This Court continued, "In his decision, the ALJ repeatedly noted the absence of functional assessments by the plaintiff's treating providers and assigned the greatest weight to the functional assessment provided by an APRN who ha[d] no underlying treatment records." *Id*. Moreover, in *Wallace I*, this Court acknowledged that the ALJ was "correct that there [were] inconsistencies in the medical evidence, yet the ALJ did not reconcile these inconsistencies." (*Id.* at 1522). In sum, the Court held that the "record [could not] be considered adequate to permit an informed finding by the ALJ of the plaintiff's RFC, and remand [was] warranted." (*Id.* at 1524). (citations omitted).

Upon remand, the ALJ held a second hearing and then issued her decision denying benefits. The plaintiff argues that, despite the fact that this Court remanded this case because the ALJ "lacked function by function analyses in the medical record and decided to apply the greatest

11

weight on the one such analysis in the record which was not made by a treating source and which [was] not supported by any treating records from that provider[,]" upon remand, the ALJ failed "to secure opinions of treating physicians and clinicians as to limitations resulting from the plaintiff's impairments[.]" (Pl. Mem. at 2, 4). The plaintiff asserts that the "ALJ's failure to follow the law and this Court's order" which was binding on the ALJ by the Appeals Council's January 15, 2019 order, constituted plain error. (*Id.* at 5).

In response, the defendant argues that, upon remand, the circumstances "greatly" changed in that the plaintiff modified his alleged onset date, "shortening the timeframe under consideration to a four-year period[,]" starting with the "day he was discharged successfully from alcohol rehabilitation." (Def. Mem. at 1). Thus, while the materiality of the plaintiff's alcohol abuse disorder was an issue in *Wallace I*, it was no longer an issue on remand given the change in circumstances. Additionally, the defendant argues that because, on remand, the ALJ was evaluating a closed, four-year period that began seven years earlier, "later-obtained opinions about [the] [p]laintiff's functioning through January 31, 2016, would have questionable value in that they would likely be based on dated treatment notes that were already part of the record." (Def. Mem. at 6).

With respect to the plaintiff's mental impairments, the ALJ "note[d] the December 2011 consultative examination report" which indicated "dementia and intellectual functioning in the very low range with a full scale IQ score of 47." (Tr. 1402). The ALJ continued, "While this report does purport to be valid, the undersigned does not find it to be probative as to the claimant's functioning." (*Id.* (citations omitted)). The ALJ then noted that the "2011 consultative examination report contains notable inaccuracies and contradictions." (*Id.* (citation omitted)). The ALJ went on to conclude, "in consideration of his longitudinal treatment history," the plaintiff is

12

"limited to . . . simple, routine tasks involving no more than simple, short instructions and simple, work-related decisions with few [workplace] changes." (Tr. 1403). After considering what she described as the "objective evidence of record" and the plaintiff's "symptom complaints," as well as the "claimant's history of angioplasty and his continued ventricular hypertrophy," the ALJ "limited him to medium work with the stated climbing, postural and environmental restrictions." (*Id.*).

While the ALJ need not address the materiality of the plaintiff's alcohol abuse disorder on remand given that his amended onset date post-dated his successful recovery from alcohol abuse, the ALJ still had the obligation to affirmatively develop the record to determine what the plaintiff could do given his limitations. The Court cannot accept the defendant's argument that, because so much time has passed since the plaintiff's treating providers assessed him during the relevant, closed-period of alleged disability, seeking such opinions now would be fruitless. Indeed, this situation arises in a great number of social security cases. By the time a case reaches the appeal to a federal court, years have often passed. Thus, to adopt the defendant's argument would be to hold that the importance of developing the record can be obviated by the passage of time, or stated another way, that remand for the development of the record is not appropriate given the length of time between the treatment sought by the claimant during a covered period of disability and the entry of judgment on appeal. The Court cannot reach that conclusion. *See Haskins v. Astrue*, No. 08-CV-1107 (FJS), 2010 WL 3338742, at *7 (N.D.N.Y. Apr. 23, 2010) (acknowledging that "a number of years have passed since Plaintiff's [date last insured]. However, this does not absolve the ALJ of his duty to attempt to obtain a fully developed record for the time period at issue.").

The ALJ may re-contact the plaintiff's treating physicians, Dr. Nowicki notwithstanding,[4] in an attempt to obtain their opinions of the plaintiff's ability to work during this closed period, and, in the event the physicians are unable to provide the necessary information, the ALJ must further develop the record by requesting a consultative examination and/or soliciting opinion evidence from a medical expert. *See id.;* 20 C.F.R. §§ 404.1512(f), 404.1512(f)(2)(iii). If the ALJ is able to secure a retrospective opinion[5] from a subsequent treating physician, the Second Circuit has made clear that, while that opinion is not entitled to the controlling weight afforded to the opinion of a treating physician during the relevant time period, that "does not mean that the opinion is not entitled to significant weight." *Campbell v. Astrue*, 596 F. Supp. 2d 446, 452 (D. Conn. 2009) (citing *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981)); *see also Monette v. Astrue*, 269 F. App'x 109, 112 (2d Cir. 2008)).

Contrary to the defendant's contention, under the circumstances here in which the Court remanded the case precisely for the development of the record to obtain assessments of the plaintiff's functional limitations, it is "legal error" for the ALJ to "fail[ ] to request a retrospective assessment from a claimant's treating physician, or at least from a consultative physician[ ]" so that the record evidence contains "all the information [the Commissioner] need[s] to make [a] determination" on disability. *Freund v. Berryhill*, No. 17-CV-9967 (JPO), 2019 WL 1323992, at *10 (S.D.N.Y. Mar, 25, 2019) (citing *Rogers v. Astrue*, 895 F. Supp. 2d 541, 551–52 (S.D.N.Y.

---

[4] Dr. Nowicki retired in 2014 and passed away in 2019. (Tr. 109, 1803).

[5] "Retrospective diagnoses and opinions are those from a treating physician that relate to a time period in the past, including periods when the physician was not the treating source." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012), *report and recommendation adopted*, No. 11-CV-7727 (WHP), 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

‼
!

2012) (remanding for ALJ to solicit a retrospective diagnosis where there was "almost no medical evidence in the record from during the relevant time period")); *see also Charles M. v. Berryhill*, No. 5:18-CV-92, 2019 WL 3886901, at *9 (D. Vt. Aug. 19, 2019) (holding that the "ALJ improperly failed to recontact [the treating physician] to determine whether the limitations he identified applied to the relevant period or whether he could assess Plaintiff's functional capacity during the relevant period").

"What is valuable about the perspective of the treating physician and what distinguishes this evidence from the examining physician and from the ALJ is [the treating physician's] opportunity to develop an informed opinion as to the physical [and/or mental] status of a patient." *Seekins v. Astrue*, Civ. No. 3:11-CV-264 (VLB), 2012 WL 4471264, at *5 (D. Conn. Sept. 27, 2012) (citing *Peed v. Sullivan*, 778 F. Supp. 1241, 1246 (E.D.N.Y. 1991)); *see Peed*, 778 F. Supp. at 1247 (holding that "[an ALJ] cannot replace the diagnosis of the doctor who knows the patient best with his own reading of the claimant's history"). In the absence of what the defendant described as "later-obtained opinions about [the] [p]laintiff's functioning" based on earlier treatment records, the ALJ was left to formulate the plaintiff's RFC on the basis of the medical findings in the treatment records.

An ALJ is not a medical professional and errs in reaching an RFC determination based on her own interpretation of the records. Stated another way:

> An ALJ is prohibited from 'playing doctor' in the sense that 'an ALJ may not substitute his own judgment for competent medical opinion. . . . This rule is most often employed in the context of the RFC determination when the claimant argues either that the RFC is not supported by substantial evidence or that the ALJ has erred by failing to develop the record with a medical opinion on the RFC.

*Quinto v. Berryhill*, No. 3:17-CV-00024 (JCH), 2017 WL 6017931, at *12 (D. Conn. Dec. 1, 2017) (citations omitted). While the Second Circuit has held that, in some cases, an ALJ may reach her

15

RFC determination based on contemporaneous treatment records, the record must contain "'sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity[,]'" such that the "determination [is] adequately supported by more than a mere scintilla of evidence." *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8-9 (2d Cir. 2017) (summary order) (quoting *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order)). After considering the "'circumstances of the particular case, the comprehensiveness of the administrative records, and . . . whether an ALJ could reach an informed decision based on the record[,]'" *Holt v. Colvin*, No. 16-CV-01971 (VLB), 2018 WL 1293095, at *7 (D. Conn. Mar. 13, 2018) (quoting *Sanchez v. Colvin*, No. 13 Civ. 6303 (PAE), 2015 WL 736102, at *5-6 (S.D.N.Y. Feb. 20, 2015), this Court held in *Wallace I* that remand was necessary to develop the record.

In other words, this case was remanded precisely because the record lacked sufficient evidence from which the ALJ could assess the plaintiff's RFC. "ALJs have acknowledged throughout the years that the remand instructions they receive from the federal district court are the law of the case." *Gladle v. Astrue,* 12-CV-284 (NAM), 2013 WL 4543147, at *3 (N.D.N.Y. 2013) (citation and internal quotations omitted). "The law of the case doctrine, while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir. 2008) (citation and internal quotations omitted). While the Court is keenly aware of the nearly ten years that have passed since the plaintiff's initial application for benefits and the two previous remand orders in this case, as the Second Circuit has directed, remand is necessary when "the medical records obtained by the ALJ do not shed any light on [the plaintiff's] residual functional capacity, and the consulting doctors did not personally evaluate [the

16

plaintiff]." *Guillen v. Berryhill*, 697 F. App'x 107, 108-09 (2d Cir. 2017) (remanding because the medical records "offer no insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of everyday life"). The ALJ has an obligation to follow the Court's remand order and the ALJ's decision regarding the plaintiff's functional limitations, and in turn, the impact such limitations have on his ability to work, must be based on substantial evidence in the record. Once again, that did not occur in this case.

### B.    THE ALJ'S TREATMENT OF THE OPINIONS OF RECORD

The duty to develop the record and the treating physician rule "do not operate independently of each other[;]" *Peed*, 778 F. Supp. at 1246, rather, the two are "inextricably linked[.]" *Lacava v. Astrue,* No. 11-CV-7727 (WHP)(SN), 2012 WL 6621731, at *12 (S.D.N.Y. Nov. 27, 2012) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability. . . . Until [the] ALJ satisfies this threshold requirement, the ALJ cannot even begin to discharge his [or her] duties . . . under the treating physician rule."); *Peed*, 778 F. Supp. at 1246.  As discussed above, the ALJ erred in failing to follow the remand order, and, in turn, in failing to develop the record. The ALJ disregarded the June 26, 2015 testimony of the plaintiff's treating physician, Dr. Nowicki, and, without developing the record as to the plaintiff's functional limitations during the relevant period, erred in her consideration of the plaintiff's treating physician opinions. Moreover, when the record "do[es] not shed any light" on a claimant's RFC, the opinion of a non-examining state agency consultant is ordinarily not a sufficient substitute for the opinion of the claimant's treating provider." *Guillen*, 697 F. App'x at 108-09.  Thus, the ALJ's assignment of "[g]reater weight" to the opinion of the State agency physicians who found the plaintiff capable of "medium and simple work[,]" and the assignment of "[g]reat weight" to the opinion related to the plaintiff's mental

residual functional capacity does not constitute substantial evidence to support her RFC determination. Accordingly, in light of the need for remand to obtain medical statements about the plaintiff's functional limitations, the ALJ erred in rejecting the treating physician opinions in the record in favor of reaching a decision about the plaintiff's functional assessment based on her own consideration of the underlying treatment records.

### C. REMANING ARGUMENT

The plaintiff asserts also that the ALJ erred at Step Five in concluding that the plaintiff was capable of engaging in *occasional* stooping and therefore could perform the jobs of a material handler and cleaner, though the description of these jobs in the *Selected Characteristics of Occupation* clearly requires *frequent* stooping. (Pl. Mem. at 14-17). Thus, the plaintiff argues that the vocational expert's job incidence data was "infirm," rendering the Step Five finding unsupported. (*Id.*). Because the Court has concluded that the ALJ failed to follow the remand order, and in doing so, reached an RFC determination that was not supported by the record, the plaintiff's RFC must be revisited on remand. "The issue of whether an ALJ has satisfied [her] obligation to develop the record is one that must be addressed as a threshold issue[,]"*Camarota v. Comm'r of Soc. Sec.* 3:19-CV-0133 (RMS), 2020 WL 132437, at *5 (D. Conn. Jan. 13, 2020) (citation and internal quotation marks omitted), and the RFC determination on remand will necessarily impact the remaining steps in the sequential analysis. *See Delgado v. Berryhill*, No. 3:17 CV 54 (JCH), 2018 WL 1316198 at *19 (D. Conn. Mar. 14, 2018) (holding that the case is "already being remanded for other reasons," and "because [the plaintiff's] RFC may change after full development of the record," the ALJ is likely to need to reconsider the other steps in the five-step analysis). A determination of the plaintiff's functional limitations will necessarily impact the

types of jobs the plaintiff may or may not be able to perform. Accordingly, in light of the remand order, it is premature for the Court to address this argument.

Although this case is remanded for further proceedings, the Court is "mindful 'of the often painfully slow process by which disability determinations are made, and that a remand for further evidentiary proceedings (and the possibility of further appeal) could result in substantial additional delay'" beyond the nearly ten years that have passed since the plaintiff's initial application for benefits. *Michaels v. Colvin*, 621 F. App'x. 35, 41 (2d Cir. 2015) (summary order) (quoting *Butts v. Barnhart,* 388 F.3d 377, 387 (2d Cir. 2004) (internal quotation marks and citation omitted), *amended on reh'g in part,* 416 F.3d 101 (2d Cir. 2005). Accordingly, the Court directs that further proceedings before the ALJ be completed "within 120 days of the issuance" of this remand order. *See id.*

## VI. CONCLUSION

For the reasons stated above, the plaintiff's Motion to Reverse the Decision of the Commissioner (Doc. No. 13) is GRANTED such that this case is remanded for additional proceedings consistent with this Ruling, and the defendant's Motion to Affirm (Doc. No. 14) is DENIED.

This is not a recommended ruling. The consent of the parties allows this magistrate judge to direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure. Appeals can be made directly to the appropriate United States Court of Appeals from this judgment. *See* 28 U.S.C. § 636(c)(3); FED. R. CIV. P. 73(c).

Dated this 19th day of February, 2021 at New Haven, Connecticut.

                                                      /s/Robert M. Spector, USMJ
                                                      Robert M. Spector
                                                      United States Magistrate Judge